FILED
2013 Apr-18  AM 08:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| BILLY RYAN LOONEY, by and through his parents, YOLANDA BENTLEY-LOONEY and BILLY LOONEY; ANIAYAH TODD-GREEN and AJIAYAH TODD-GREEN, by and through their mother, DEMEATRESS GREEN; JAMES RODGERS, by and through his mother, MECHELLE BROWNNING-RODGERS; BRESHAN COLLINS, by and through his mother SHARRISSA COOK; and JAIDEN ALEXANDER, by and through his mother GEORGETTE ALEXANDER, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>SHEILA D. MOORE, DIRECTOR OF THE OFFICE OF THE UNIVERSITY OF ALABAMA INSTITUTIONAL REVIEW BOARD; FERDINAND URTHALER, M.D., CHAIRMAN OF THE UNIVERSITY OF ALABAMA INSTITUTIONAL REVIEW BOARD; THE INDIVIDUAL MEMBERS OF THE UNIVERSITY OF ALABAMA INSTITUTIONAL REVIEW BOARD; and WALDEMAR A. CARLO, M.D., all in their individual capacities; ABC HEALTH CARE PROVIDERS #1-100; ABC INDIVIDUALS #1-100; and XYZ ENTITIES #100,<br><br>      Defendants. | Docket No.<br><br>A CIVIL ACTION<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs Billy Ryan Looney, by and through his parents Yolanda Bentley-Looney and Billy Looney, Aniayah Todd-Green and Ajiayah Todd-Green, by and through their mother Demeatress Green, James Rodgers, by and through his mother Mechelle Brownning-Rodgers, Breshan Collins, by and through his mother Sharrissa Cook, and Jaiden Alexander, by and through his mother Georgette Alexander, individually and on behalf of all others similarly

situated, by and through their counsel, Alan C. Milstein and Michael Dube of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. and Reginald McDaniel, by way of Complaint against Defendants Sheila D. Moore, Director of the University of Alabama Institutional Review Board, Ferdinand Urthaler, M.D., Chairman of the University of Alabama Institutional Review Board, the individual members of the University of Alabama Institutional Review Board, and Waldemar A. Carlo, M.D., all in their individual capacities, ABC Health Care Providers #1-100, ABC Individuals #1-100, and XYZ Entities #1-10 (collectively, "Defendants"), hereby say, state, and aver as follows:

## INTRODUCTION

1.     All human subjects research must be designed to protect the needs of vulnerable members of society, including children.  See, e.g., 45 C.F.R. § 46.111(a) (providing that "[i]n evaluating risks and benefits, the IRB … should be particularly cognizant of the special problems of research involving vulnerable populations, such as children").

2.     This case involves clinical research performed on infants born very prematurely with extremely low birth weights, who depend upon receiving the appropriate quantity of oxygen in order to survive and thrive, and depend upon the individuals responsible for their treatment to act in their best medical interests.

3.     The standard of care dictates that a physician treating a premature, low-birth-weight infant must select an appropriate blood oxygen saturation level of between eighty-five and ninety-five percent, as dictated by the infant's specific medical needs, and that level should be adjusted in accordance with the infant's individual specific needs and progress.

4.     The Plaintiffs, who were all born prematurely and with low birth weights, participated in a study at the University of Alabama that was conducted between 2004 and 2009 wherein they randomly received a fixed amount of oxygen (either low or high).

5.      The study was unethical by design because, among other things, the infants who were the human subjects were randomized into the two arms of the study; in other words, the amount of oxygen initially received by each subject was determined by "the flip of a coin," and that amount was not adjusted in accordance with individual medical needs.

6.      The study was further unethical by design because the informed consent document failed to disclose to the parents of the subjects any risks whatsoever with respect to which arm of the study their infants were randomized into, beyond the small risk of a minor skin breakdown.

7.      The researchers should have known that, because of what is referred to as "the therapeutic misconception," parents of such infants desired one thing and one thing alone: that their newborn babies receive the best care to fit their individual needs and that they would never consent to their children receiving care based only on the need of researchers achieving some generalized knowledge.

8.      The Office of Human Research Protection ("OHRP") recently determined that the University of Alabama's "conduct of this study was in violation of the regulatory requirements for informed consent, stemming from the failure to describe the reasonably foreseeable risks of blindness, neurological damage and death," and further determined that "participating in the study did have an effect on which infants died, and on which developed blindness."

9.      As a direct and proximate result of the Defendants' wrongful conduct, the Plaintiffs (and others similarly situated) have suffered permanent neurological and vision issues, among other catastrophic injuries.

## THE PARTIES

10.     The Plaintiffs are as follows:

-3-

  a. Billy Ryan Looney is a minor child born in 2005 at UAB Hospital. He resides with his mother Yolanda Bentley-Looney in Medina, Ohio. His father, Billy Looney, resides in Ashville, Alabama.

  b. Aniayah and Ajiayah Todd-Green are minor children born in 2008 at UAB Hospital. They reside with their mother Demeatress Green in Fairfield, Alabama.

  c. James Rodgers is a minor child born in 2006 at UAB Hospital. He resides with his mother Mechelle Brownning-Rodgers in Birmingham, Alabama.

  d. Breshan Collins is a minor child born in 2006 at UAB Hospital. His mother, Sharrissa Cook, has custody over Breshan.

  e. Jaiden Alexander is a minor child born in 2009, who stayed at UAB for four months, until July 2009. He resides with his mother Georgette Alexander in Bessemer, Alabama.

11. The Defendants are as follows:

  a. Sheila D. Moore is the Director of the University of Alabama Institutional Review Board, the entity charged with overseeing human subjects research at the University of Alabama (when abbreviated, "UAB IRB"). Her business address is believed to be 358 Rose Administration, Box 870127, Tuscaloosa, AL 35487.

  b. Ferdinand Urthaler, M.D. is the Chairman of the University of Institutional Review Board. His business address is believed to be Zeigler Research Building, Room 538, 703 19th Street South, Birmingham, AL 35294.

  c. The individual members of the University of Alabama Institutional Review Board are individuals, whose names are presently unknown to the Plaintiffs, who serve as members of the UAB IRB.

d.      Waldemar A. Carlo, M.D. is an individual licensed by the State of Alabama to practice medicine, who served as the principal investigator for the human subject experiment at issue herein.   He practices in the subspecialty of pediatric neonatology and directs the Division of Neonatology at the UAB Hospital.  His address is 1700 6th Avenue South, Birmingham, AL 35233.

e.      The foregoing Defendants are being sued in their individual capacities.

f.      ABC Health Care Providers #1-100, whose identities are currently unknown or not fully known to the Plaintiffs, are physicians, nurses, and other health care providers who provided care to the Plaintiffs at all relevant times.

g.      Individuals #1-100 are individuals, whose identities are currently unknown or not fully known to the Plaintiffs, that bear or may bear responsibility for the incident in suit.

h.      XYZ Entities #1-100 are entities, whose identities are currently unknown or not fully known to the Plaintiffs, that bear or may bear responsibility for the incident in suit.

## SUBJECT MATTER JURISDICTION

12.     As there are more than 100 class members, and those class members' claims exceed $5,000,000 in the aggregate, this Court has subject matter jurisdiction over the claims of all class members from all states pursuant to the Class Action Fairness Act of 2005.  See 28 U.S.C. §§ 1332(d), 1453, 1711-1714.

## VENUE

13.     Venue is proper in the United States District Court for the Northern District of Alabama because a substantial part of the events giving rise to this lawsuit occurred within the territory encompassed by this Court.  See 28 U.S.C. § 1391(b)(2).

## FACTS COMMON TO ALL COUNTS

### I.

14.     This is a class action brought on behalf of the Plaintiffs and all similarly situated individuals who were injured by participating in a multi-site, randomized human subject experiment called "the Surfactant, Positive Pressure, and Oxygenation Randomized Trial" ("Experiment").

15.     The Belmont Report, issued in 1979 by the National Commission for the Protection of Research Subjects in Biomedical and Behavioral Research, sets forth three principles to guide human subject research.

16.     It provides that, in order for human subject research to be ethical, the research must be designed in accordance with "the ethical principles of Respect for Persons, Beneficence and Justice."

17.     The Experiment was contrary to the principle of Respect for Persons because it treated the human subjects as objects to be studied, if not worse, and failed to ensure the subjects' parents had provided their informed consent.

18.     The Experiment was contrary to the principle of Beneficence because the risk of injury to human subjects was outweighed by any possible benefits.

19.     The Experiment was contrary to the principle of Justice because the Experiment exclusively targeted those who are among the most vulnerable members of the population: very premature, extremely low-birth-weight neonates, many of whom come from difficult economic backgrounds.

20.     In 1991, federal regulations governing human subject research were integrated into the "Common Rule," the most familiar incarnation of which is the Department of Heath and Human Services regulations found at 45 C.F.R. § 46.101, et seq.  Among other things, these

regulations detail the conditions required for obtaining informed consent and what information must be provided, restrict experiments to those in which risks are minimized, require the equitable selection of research subjects, establish the requirement of institutional review boards, and implement special safeguards where children are involved.  Indeed, the director, chair, and members of the UAB IRB serve as an essential safeguard for participants in human subject research.

21.     As will be demonstrated, the Experiment was contrary to the requirements of the Common Rule in virtually every respect.

## II.

22.     As of the year 2004, the medical community had long been aware that the amount of oxygen a premature infant is exposed to impacts a number of important health outcomes, including the development of a severe eye disease known as "retinopathy of prematurity" (which frequently leads to blindness), reduced neurologic development (including brain damage), chronic lung disease, and death.

23.     The medical community was further aware that oxygen levels that were too low could led to death, and oxygen levels that were too high could lead to retinopathy of prematurity, and therefore it was critical to strike a careful balance between low (death) and high (blindness), based upon a neonate's individualized medical needs.

24.     Between 2004 and 2009, approximately 1,300 premature and/or low-birth-weight infants were enrolled in the Experiment, including Plaintiffs Billy Ryan Looney (who weighed 1 pound, 7 ounces at birth), Aniayah and Ajiayah Todd-Green (who were significantly underweight at birth), James Rodgers (who weighed 1 pound, 4 ounces at birth), Breshan Collins (who weighed 1 pound, 11 ounces at birth), and Jaiden Alexander (who weighed 1 pound, 4 ounces at birth).

25.     The Plaintiffs were all enrolled in the Experiment at the University of Alabama-Birmingham ("UAB-Birmingham") and UAB Hospital, where Ms. Moore, Dr. Urthaler, and the individual members of the UAB IRB served as the institutional review board overseeing the Experiment, and Dr. Carlo served as the principal investigator for the Experiment.

26.     On information and belief, the foregoing individuals and/or the fictitiously named Defendants designed the protocol governing the Experiment, and drafted the informed consent document.

27.     The Experiment purportedly had two aspects: (1) exploring treatment with continuous positive airway pressure (i.e., positive pressure applied with a face mask to help keep an infant's lungs inflated) ("CPAP Aspect"); and (2) determining the appropriate levels of oxygen saturation in extremely low-birth-weight infants by comparing a lower versus a higher range of levels of oxygen saturation in such infants ("Oxygen Aspect").

28.     UAB-Birmingham served as the lead site in connection with the Oxygen Aspect of the Experiment.

29.     The Oxygen Aspect of the Experiment was a misguided effort to test the effects of receiving too little or too much oxygen on infants' survival, neurological development, and likelihood of developing retinopathy of prematurity.

30.     Infants, including the Plaintiffs, were "randomized" within the Experiment such that, without regard to their individual medical needs, they randomly received either the lower or higher ranges of oxygen levels, which levels were not subject to adjustment.

31.     Indeed, whether each Plaintiff and each study participant would receive oxygen within the "low" or "high" range was determined by, in the words of the informed consent form, "the flip of a coin."

32.    Blood oxygen saturation ($SpO_2$), the percentage of hemoglobin in the infant's bloodstream that has oxygen bound to it, was monitored via a pulse oximeter applied to the infant's foot or hand.

33.    The amount of oxygen provided to an infant was adjusted to try to keep the $SpO_2$ within the "low" or "high" range to which the infant had randomly been assigned.

34.    The amount of oxygen provided was not tailored to the infant's actual needs or the best medical interests of the infant.

## II.

35.    The protocol included the customary section entitled "Risks and Benefits"; this section failed to identify any risks associated with subjects being randomized into the "low" or "high" arms of the trial.

36.    The model informed consent document for the Experiment listed the risks of the study as follows:

> Participation in this study may involve some added risks or discomforts.  Because all of the treatments proposed in this study are standard of care, there is no predictable increase in risk for your baby.  Infants randomized to the CPAP group may, at some point in their care, require intubation and assisted ventilation (methods to help them breathe). If the attending physician deems this necessary, participation in the study will not affect this decision. Some unknown risks may be learned during the study.  If these occur, you will be informed by the study personnel.  The only other risk of this study is the risk to confidentiality.  Every effort will be made to keep your child's medical record confidential.  There will be no name or other patient identification in any study report that may be published after the study is completed.  Measures taken to protect you and your baby's identity are described in the confidentiality section of this document.

37.    Thus, this document provided one risk related to the CPAP Aspect of the study and only one risk related to the Oxygen Aspect of the study: the risk that the names of enrollees could not be kept confidential.

38.     In a letter dated March 7, 2013 ("March 7 Letter"), the OHRP concluded as follows:

>   1. The paragraph does not include any information about the prior research and analyses that had been done looking at the relationship between oxygen and ROP, and what that work indicates about how changing the oxygen range might affect whether an infant develops ROP.
>
>   2. The paragraph does not include any information about the prior research and analyses that had been done looking at the relationship between oxygen and mortality and other forms of morbidity (apart from developing ROP).
>
>   3. The paragraph does not identify any specific risk relating to randomizing infants to a high or low range of oxygen.

See March 7 Letter, a true and correct copy of which is attached to the Complaint as **Exhibit "A,"** page 6.

39.     The March 7 Letter further noted as follows: "Although the consent form did not identify a single specific risk relating to the randomization to high or low oxygen ranges, it did include a section that was quite specific in noting possible benefits to participating infants from the change in oxygen ranges."  See Exhibit A, page 7.

40.     The March 7 Letter further observed as follows:

>   c.  The template for the consent form used in this study did not mention any risks relating to the randomization between the higher and lower levels of oxygen, instead suggesting that this was a low risk study, noting that all of the treatments in the study were "standard of care," and that there was "no predictable increase in risk for your baby."
>
>   d.  While it would have been unwarranted to predict, ahead of time, specific outcomes (i.e., which infants developed which outcomes), the researchers had sufficient available information to know, before conducting the study, that participation might lead to differences in whether an infant survived, or developed blindness, in comparison to what might have happened to a child had that child not been enrolled in the study.

See Exhibit A, page 8.

41.     At all relevant times, the Defendants were aware that infants who participated in the Experiment would be placed at an increased risk of death (because of receiving too little oxygen), blindness (because of receiving too much oxygen), and lung disease and neurological damage (because of not receiving the appropriate amount of oxygen).

42.     Despite this, the informed consent document provided to parents at the University of Alabama, including the Plaintiffs' parents, failed to describe the reasonably foreseeable risks of blindness, neurological damage, respiratory ailments, and death.

43.     Rather, in the section labeled "Possible Risks," the document simply stated as follows: "There is no known risk to your baby from monitoring with the pulse oximeters used for this study. The possible risk of skin breakdown at the site will be minimized by your baby's nurse moving the oximeter to another arm or leg a couple of times a day."

44.     In the March 7 Letter, the OHRP concluded as follows with regard to this informed consent document:

> 1.  The form does not say that there may be a greater or lesser risk of death depending on whether the infant is in the lower or upper range group.
>
> 2. While the form says that being in the *lower* range group may result in the *benefit* of decreasing the chances of developing severe ROP, in the "Possible Risks" section it does not say that being in the *upper* range group may result in the *greater* risk of developing ROP.
>
> 3.  The only risk related to the part of the study involving the two ranges of oxygen levels described in the "Possible Risks" section is the risk of the pulse oximeter to the infant's skin.

See Exhibit A, pages 8-9 (italicization in original).

45.     Contrary to the clear requirements of 45 C.F.R. § 46.116(a)(2), the informed consent documents failed to include or adequately describe any reasonably foreseeable risks and discomforts.  See 45 C.F.R. § 46.116(a) (mandating that "in seeking informed consent the

following information shall be provided to each subject: … A description of any reasonably foreseeable risks or discomforts to the subject").

46.     In the March 7 Letter, the OHRP determined that the informed consent form used at the University of Alabama violated 45 C.F.R. § 46.116(a)(2) by failing to adequately describe the risks of participation in the Experiment.  The OHRP further concluded as follows:

> It would have been appropriate for the consent form to explain (i) that the study involves substantial risks, and that there is significant evidence from past research indicating that the level of oxygen provided to an infant can have an important effect on many outcomes, including whether the infant becomes blind, develops serious brain injury, and even possibly whether the infant dies; (ii) that by participating in this study, the level of oxygen an infant receives would in many instances be changed from what they would have otherwise received, though it is not possible to predict what that change will be; (iii) that some infants would receive more oxygen than they otherwise would have, in which case, if the researchers are correct in how they suppose oxygen affects eye development, those infants have a greater risk of going blind; and (iv) that the level of oxygen being provided to some infants, compared to the level they would have received had they not participated, could increase the risk of brain injury or death.
>
> Accordingly, we determine that the informed consent document for this trial failed to adequately inform parents of the reasonably foreseeable risks and discomforts of research participation.

See Exhibit A, page 9-10.

47.     The informed consent document also stated that, because both groups of infants (the ones receiving more oxygen, and the ones receiving less) would receive levels of oxygen within the standard of care (eighty-five to ninety-five percent), there was no increased risk to the infants; in reality, as the OHRP found, it was not the standard of care for an infant to receive a *random* level between eighty-five and ninety-five percent, which would not be adjusted, and many infants therefore faced far greater risks by participating.

48.     Indeed, in the Experiment, if an infant's individual needs would have otherwise caused doctors to select a high level of oxygen (e.g., ninety-five percent), those needs would be

utterly ignored if the infant happened to be randomly assigned, by "the flip of a coin," to receive the lower oxygen levels (e.g., eighty-five percent).

49.     The Plaintiffs' parents would not have enrolled the Plaintiffs had they been informed of the true risks, benefits, and nature of the Experiment.

50.     Conducing the Experiment was inherently unethical because, among other things, it exposed the most vulnerable members of society to far more than minimal risk, the benefits did not outweigh the risks, and informed consent was virtually nonexistent.

51.     As a direct and proximate result of the Defendants' wrongdoing, Plaintiff Billy Ryan Looney suffers from severe and permanent visual and respiratory issues, among other severe and permanent impairments; Plaintiffs Aniayah Todd-Green and Ajiayah Todd-Green suffer from severe and permanent retina and eyesight disorders, and respiratory disease (including asthma), and are experiencing developmental delays, among other severe and permanent impairments; Plaintiff James Rodgers suffers from severe and permanent brain damage, vision issues, severe underdevelopment, and respiratory disease (including asthma), among other severe and permanent impairments; Plaintiff Breshan Collins suffers from severe and permanent developmental delays, PDA valve, and visual and respiratory issues, among other severe and permanent impairments; and Plaintiff Jaiden Alexander suffers from underdeveloped lungs, an underdeveloped liver, and a heart murmur, among other severe and permanent impairments.

## **CLASS ACTION ALLEGATIONS**

52.     This action is being brought as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(l), 23(b)(2), and 23(b)(3), on behalf of a class ("Class") consisting of the following:

**All individuals who participated in the human subject experiment called "the Surfactant, Positive Pressure, and Oxygenation Randomized Trial (SUPPORT)" at the University of Alabama and have as a result suffered injuries and damage.**

53.     The Class is so numerous that joinder of all members is impracticable.  See Federal Rule of Civil Procedure 23(a)(1).

54.     The exact size of the Class and the members thereof are ascertainable through the Defendants' business records.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions effecting solely individual members of the Class.  See Federal Rule of Civil Procedure 23(a)(2).

56.     The claims of the Plaintiffs and the Class arise from the same wrongful conduct, and are based upon the same legal theories.

57.     The Plaintiffs' claims are typical of the claims of the other members of the Class, as the Plaintiffs and all other members of the Class were damaged in the same way.  See Federal Rule of Civil Procedure 23(a)(3).

58.     The Plaintiffs will fairly and adequately represent the interests of the Class, and have retained counsel competent and experienced in class action litigation and uniquely qualified to represent the Class in matters relating to the unethical conduct of human subject research. See Federal Rule of Civil Procedure 23(a)(4).

59.     The Plaintiffs and their counsel are committed to vigorously pursuing this matter, and have the financial resources to do so.

60.     The Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  See Federal Rule of Civil Procedure 23(b)(3).

62.   The expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the unlawful conduct alleged.

63.   Moreover, as set forth above, common questions of law and fact exist as to all members of the Class and predominate over any questions that solely affect individual members of the Class.  These common questions include the questions of whether the Defendants failed to secure informed consent from the parents of the Plaintiffs and the members of the Class, whether the study was unethical by design, whether the informed consent document was improper, and whether the design of the study and contents of the informed consent document could proximately cause harm to the human subjects enrolled.

64.   The Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT ONE – NEGLIGENCE

65.   The Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

66.   The Defendants, individually and by and through their employees and agents, were charged with conducting an ethical experiment where risks did not exceed benefits, determining the universe of harm through proper preclinical animal studies, properly conducting the informed consent process, rendering proper care and treatment to the Plaintiffs and the Class, properly and carefully designing and administering the Experiment's protocol in a careful and prudent fashion, assuring that proper care and attention were provided during all periods of time during which the Plaintiffs and Class remained under care and treatment, and candidly and honestly advising of the results, consequences, and true nature of the Experiment.

67.   As set forth above and throughout, the Defendants, individually and by and through their employees and agents, breached their obligations and duties.

-15-

68.     As a result of the careless, negligent, and reckless conduct of the Defendants, the Plaintiffs and the Class were caused to suffer excruciating and agonizing pain, physical discomfort, and emotional distress.

69.     The Defendants, individually and through their respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel, medical assistants, and employees, were careless, negligent, and reckless in at least the following particulars:

a.     Failing to the advise the legal representatives of the Plaintiffs and the Class of all the risks of the Experiment and other details that would have afforded them the opportunity to make an informed decision as to whether to participate;

b.     Failing to conduct an ethical experiment in accordance with the state and federal standards and guidelines governing human subject research, internal standards and guidelines governing human subject research, and other external and internal laws and policies;

c.     Designing and conducting an inherently unethical and flawed experiment;

d.     Failing to determine the universe of harm through preclinical animal studies, and failing to conduct preclinical animal studies;

e.     Failing to properly conduct the informed consent process;

f.     Failing to disclose the conflicts of interest inherent in the Experiment;

g.     Failing to provide a subject advocate;

h.     Failing to properly and adequately treat and care for the Plaintiffs' and the Class' condition;

i.     Failing to perform proper and careful research practices and procedures in accordance with the standards prevailing in the community;

j.      Caring for the Plaintiffs and the members of the Class in a negligent and improper manner;

k.      Failing to properly monitor the condition of the Plaintiffs and the members of the Class;

l.      Failing to properly and timely observe, discover, diagnose, treat, and care for their condition;

m.      Failing to exercise reasonable care under all of the circumstances, in accordance with the accepted practices and procedures in the community and elsewhere;

n.      Failing to design, implement, and monitor an experiment in accordance with the ethical standards for such experiments;

o.      Engaging in coercive tactics, exerting undue influence, and omitting material disclosures;

p.      Targeting, rather than protecting, vulnerable members of society; and

q.      Failing to treat the Plaintiffs and the Class members with respect for their human dignity as human subjects.

70.     As a direct and proximate result of the carelessness, negligence, gross negligence, recklessness, and willful and wanton conduct of the Defendants, and each of them respectively, jointly, and severally, by and through their separate and respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel, and employees, the Plaintiffs and the members of the Class were caused to sustain serious and debilitating personal injuries.

71.     The Plaintiffs and the members of the Class were caused to suffer agonizing aches, pains, and mental anguish, sustained loss of enjoyment of life and loss of life's pleasures, and suffered dignitary harm.

72.     By conducting themselves as described above, the Defendants increased the risk of harm, thereby causing the injuries to the Plaintiffs and Class members.

**WHEREFORE**, Plaintiffs Billy Ryan Looney, Aniayah and Ajiayah Todd-Green, James Rodgers, Breshan Collins, and Jaiden Alexander respectfully demand a judgment in their favor and against the Defendants, and each of them jointly and severally, compensatory damages, pre- and post-judgment interest, dignity damages, and costs of suit.

## COUNT TWO – NEGLIGENCE *PER SE*

73.     The Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

74.     Under the Common Rule, which applies to each of the Defendants, all human subject research, and all informed consent forms used in such research, must be reviewed, approved, and monitored by an institutional review board.  See generally 45 C.F.R. § 46.101, et seq.; see also 45 C.F.R. § 46.109.

75.     The Common Rule charges every IRB with ensuring that the selection of subjects is "equitable."  See id. § 46.111(a)(3).   Specifically, every IRB is charged with being "particularly cognizant of the special problems of research involving vulnerable populations," which include "children, prisoners, pregnant women, mentally disabled persons, or economically or educationally disadvantaged persons."  See id. (emphasis added).   Where vulnerable populations are involved, IRB's must put into place "additional safeguards" to protect them from coercion or undue influence.  See id. §§ 46.111(b), (d).

76.     45 C.F.R. § 46.111 further provides "[c]riteria for IRB approval of research," which includes the criteria that "[r]isks to subjects are minimized," "[r]isks to subjects are reasonable in relation to anticipated benefits," and "[i]nformed consent will be sought from each prospective subject or the subject's legally authorized representative, in accordance with, and to the extent required by § 46.116."  See 45 C.F.R. § 46.111.

-18-

77.    45 C.F.R. § 46.116 in turn requires the informed consent process to "provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate," and states that the informed consent form must contain an accurate description of the research and its purposes, and risks of participation, and a statement that participation is completely voluntary and an individual may discontinue participation at any time, among other things.  See 45 C.F.R. § 46.116.

78.    The foregoing regulations are intended to benefit individuals such as the Plaintiffs and the Class members.

79.    The Defendants violated the foregoing regulations.

80.    As a direct and proximate result of the Defendants' violations of the foregoing regulations, the Plaintiffs suffered harm.

81.    As such, the Defendants are negligent *per se*.

**WHEREFORE**, Plaintiffs Billy Ryan Looney, Aniayah and Ajiayah Todd-Green, James Rodgers, Breshan Collins, and Jaiden Alexander respectfully demand a judgment in their favor and against the Defendants, and each of them jointly and severally, compensatory damages, pre- and post-judgment interest, dignity damages, and costs of suit.

## COUNT THREE – LACK OF INFORMED CONSENT

82.    The Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

83.    The Defendants intentionally, recklessly and/or negligently enrolled the Plaintiffs and the Class members in the Experiment without obtaining informed consent, as described in detail above.

84.    Had the parents and guardians of the Plaintiffs and the Class members been fully informed, they would not have agreed to participate, or would have withdrawn from participation.

85.     As a direct and proximate result of lack of informed consent, the Plaintiffs and the Class members suffered significant pain, discomfort, and emotional distress, as set forth above.

**WHEREFORE**, Plaintiffs Billy Ryan Looney, Aniayah and Ajiayah Todd-Green, James Rodgers, Breshan Collins, and Jaiden Alexander respectfully demand a judgment in their favor and against the Defendants, and each of them jointly and severally, compensatory damages, pre- and post-judgment interest, dignity damages, and costs of suit.

## COUNT FOUR – BREACH OF FIDUCIARY DUTY

86.     The Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

87.     While Dr. Carlo was a researcher, and the Plaintiffs and Class members were human subjects in the Experiment, at the same time Dr. Carlo and the Defendants' respective agents, servants, workmen, representatives, physicians, nurses, staff, contractors, medical personnel, medical assistants, and employees, performed certain medical services such that they, on the one hand, and the Plaintiffs and the Class, on the other hand, also had a physician-patient relationship.

88.     The Defendants had a fiduciary duty to disclose all information material to the decision to provide, withhold, or discontinue consent.

89.     The Defendants had a fiduciary duty to conduct an experiment with no risk to the infant Plaintiffs and Class members, given their vulnerability.

90.     The Defendants breached their fiduciary duty by failing to disclose all information material to the decision to provide or withhold consent, or withdraw from the Experiment, and conducting an experiment subjecting infants to extreme risk.

91.     As a direct and proximate result of lack of informed consent, the Plaintiffs and the Class members suffered significant pain, discomfort, and emotional distress, as set forth above.

92.    The Defendants' conduct, as described above, was malicious, willful, and wanton, and taken in reckless disregard of the health or safety of another, justifying the imposition of punitive damages.

**WHEREFORE**, Plaintiffs Billy Ryan Looney, Aniayah and Ajiayah Todd-Green, James Rodgers, Breshan Collins, and Jaiden Alexander respectfully demand a judgment in their favor and against the Defendants, and each of them jointly and severally, compensatory damages, pre- and post-judgment interest, dignity damages, and costs of suit.

## JURY TRIAL DEMAND

A trial by twelve (12) jurors is hereby demanded on all counts and causes of action so triable.

Dated: <u>Wednesday, April 17, 2013</u>            Respectfully submitted,

LAW OFFICES OF REGINALD D. MCDANIEL

By:    <u>/s/ Reginald D. McDaniel</u>
Reginald D. McDaniel
401 37th Street South
Birmingham, AL 35222

*- and -*

SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.

By:    Alan C. Milstein (*Pro Hac Vice* Forthcoming)
Michael Dube (*Pro Hac Vice* Forthcoming)
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Facsimile: 856-488-4744

*Co-Counsel for the Plaintiff and the Class*